# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:21-cv-1621 |
| Plaintiff, | : | |
| v. | : | |
| TWENTY-EIGHT THOUSAND ONE HUNDRED EIGHTY AND 00/100 DOLLARS ($28,180.00) IN UNITED STATES CURRENCY, | : | **VERIFIED COMPLAINT FOR FORFEITURE IN REM** |
| Defendant. | : | |

Plaintiff, United States of America, by its undersigned counsel, alleges the following for its action against the defendant in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure.

## NATURE OF THE ACTION

1. This is a civil action *in rem* brought to enforce 21 U.S.C. § 881(a)(6), which provides for the forfeiture to the United States of:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

## THE DEFENDANT IN REM

2. The defendant is Twenty-Eight Thousand One Hundred Eighty and 00/100 Dollars ($28,180.00) in United States Currency. On or about November 4, 2020, the Drug Enforcement Administration ("DEA") seized the defendant from Kermit Warren, following a consensual encounter with him at the John Glenn Columbus International Airport. The United States has

deposited the defendant into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

## JURISDICTION AND VENUE

3. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant under 21 U.S.C. § 881(a)(6). This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

4. This Court has *in rem* jurisdiction over the defendant under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

5. Venue is proper in this district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio and under 28 U.S.C. § 1395 because the defendant was found in the Southern District of Ohio.

## BASIS FOR FORFEITURE

6. The defendant is subject to forfeiture under 21 U.S.C. § 881(a)(6) because it represents property furnished or intended to be furnished in exchange for a controlled substance, represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846.

## FACTS

7. On or about November 4, 2020, officers with the Columbus Regional Airport Authority ("CRAA") at the John Glenn Columbus International Airport ("CMH") notified the Columbus, Ohio DEA Airport Group about a passenger, Kermit Warren, who had been selected

deposited the defendant into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

## JURISDICTION AND VENUE

3. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant under 21 U.S.C. § 881(a)(6). This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

4. This Court has *in rem* jurisdiction over the defendant under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

5. Venue is proper in this district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio and under 28 U.S.C. § 1395 because the defendant was found in the Southern District of Ohio.

## BASIS FOR FORFEITURE

6. The defendant is subject to forfeiture under 21 U.S.C. § 881(a)(6) because it represents property furnished or intended to be furnished in exchange for a controlled substance, represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846.

## FACTS

7. On or about November 4, 2020, officers with the Columbus Regional Airport Authority ("CRAA") at the John Glenn Columbus International Airport ("CMH") notified the Columbus, Ohio DEA Airport Group about a passenger, Kermit Warren, who had been selected

for additional screening.

8. As Kermit Warren passed through the Transportation Security Administration's ("TSA") screening tools, the TSA noted that he was carrying a bulk amount of currency in a small shopping bag. TSA notified the CRAA about the currency and advised that when Kermit Warrant was asked about the currency, he became jumpy, presented a police officer's badge, and stated that he was a retired police officer.

9. CRAA contacted the Columbus, Ohio DEA Airport Group and provided them with the information about the currency carried by Kermit Warren and his statement that he was retired law enforcement.

10. The DEA Airport Group also learned that Kermit Warren was traveling with his son, Leo Warren.

11. As they continued to investigate, the DEA Airport Group learned that Kermit Warren and Leo Warren had flown into Ohio on November 3, 2020. A check with American Airlines revealed that on November 2, 2020, Kermit Warren and Leo Warren purchased one-way tickets to fly on November 3, 2020, from Louis Armstrong New Orleans International Airport ("MSY") to Cleveland Hopkins International Airport ("CLE") with a layover at the Dallas/Fort Worth International Airport ("DFW").

12. American Airlines records also revealed that on November 4, 2020, Kermit Warren and Leo Warren purchased one-way, same day tickets to fly from CMH to MSY with a layover at DFW.

13. At approximately 9:00 a.m., on November 4, 2020, DEA Task Force Officers Andrew D'Orazio ("TFO D'Orazio") and Ryan Ward ("TFO Ward") went to the CMH boarding gate designated for Kermit and Leo Warren's flight to MSY and located two men matching the

photographs the officers had obtained from the CRAA.

14. TFOs D'Orazio and Ward approached Kermit Warren and Leo Warren in a way as not to block their freedom of movement, identified themselves as law enforcement with the DEA, advised Kermit Warren and Leo Warren that they were not in trouble and were free to leave at any time, and asked if they would speak to the officers. Kermit Warren and Leo Warren each advised that they understood and agreed to speak with officers.

15. TFO D'Orazio then explained to Kermit Warren and Leo Warren that he wanted to speak to them about the bulk currency that the TSA had reported Kermit Warren was carrying. TFO D'Orazio asked if he could see the currency.

16. Kermit Warren agreed and showed TFO D'Orazio a large amount of United States currency that was rubber-banded together. TFO D'Orazio noted that the currency was inside a beanie style winter hat and carried inside of an 8" x 4" paper shopping bag.

17. Kermit Warren did not have any other carry-on bags with him or a change of clothes. Also, he had not checked a bag with the airline.

18. After seeing the currency, the officers asked Kermit Warren and Leo Warren for photo identification. Kermit Warren provided a Louisiana driver's license. Leo Warren provided his name and date of birth. The officers relayed this information to DEA Task Force Officer Eric Doyle ("TFO Doyle").

19. TFO D'Orazio then asked Kermit Warren what his reasons were for traveling to Ohio and for carrying such a large amount of currency. Kermit Warren stammered as he advised that he was in Ohio to buy a truck. Kermit Warren was unable to provide any information about the year, make, or model for the truck; the price for the truck; or any information about when or where he was to meet the seller. Warren also could not provide an advertisement or picture of

the truck.

20. TFO D'Orazio asked Kermit Warren why he still possessed the currency if he had traveled to Ohio to purchase a truck. Warren replied that the truck had the wrong type of brakes, but he was unable to explain why he had not gathered such important information about the truck before he traveled to Ohio.

21. TFO D'Orazio then asked Kermit Warren why he was flying out of Columbus when he had arrived in Cleveland. As Kermit Warren attempted to answer TFO D'Orazio's question, Leo Warren interjected and said that they had not realized there was more than one airport in Ohio.

22. Leo Warren further explained that he and his dad, Kermit Warren, had taken a cab from Cleveland to Columbus the previous night. Leo Warren claimed that they had gotten lost and slept in the woods prior to arriving at the airport.

23. When TFO D'Orazio asked Kermit Warren whether he was a retired police officer, Warren stated that he was and presented a New Orleans Police badge.

24. Shortly after Kermit Warren showed the police badge to the officers, TFO Doyle advised TFOs D'Orazio and Ward that the criminal histories for Kermit Warren and Leo Warren included arrests related to narcotics charges.

25. TFO D'Orazio then asked Kermit Warren if he could see his police identification card. Warren displayed the New Orleans Police badge again. TFO D'Orazio asked Kermit Warren where the picture identification was that goes with the badge. Kermit Warren stated that he did not have one.

26. In response to TFO D'Orazio's questioning, Kermit Warren stated that he served with the New Orleans Police Second Precinct for four years, but he initially did not respond when TFO D'Orazio asked him how he was able to retire after only four years of service. When TFO

D'Orazio repeated the question, Kermit Warren said that he had been injured.

27. Kermit Warren was unable to provide a contact with the New Orleans Police Department who could confirm his employment.

28. Kermit Warren then admitted that the badge did not belong to him and that it belonged to his other son. Investigators later determined that Kermit Warren's son, Kermit Warren, Jr., was a police officer in Lafayette, Louisiana.

29. As the conversation continued, TFOs D'Orazio and Ward noted that Leo Warren was wearing what appeared to be a United States Army tracksuit. When TFO D'Orazio asked Leo Warren whether he was an active duty member of the military, Warren advised that he was, but he was unable to produce any military identification.

30. As members of the Columbus, Ohio DEA Airport Group, TFOs D'Orzaio, Ward, and Doyle are trained and experienced and have learned to observe and detect the behavior, characteristics, and other travel indicators that help them to distinguish suspected illegal drug and drug currency couriers from the normal, non-criminal traveling public. As a result of their training and experience, the officers know the following:

    a. Persons engaged in the commercial interstate distribution of controlled substances frequently use CMH and the aircraft that arrive and depart there to transport drug sales proceeds, and funds to be used to purchase drugs, in and out of Columbus. Those proceeds and funds are usually in the form of United States currency.

    b. Persons engaged in the commercial interstate distribution of controlled substances frequently use couriers to transport controlled substances, drug sales proceeds, and funds to be used to purchase drugs in and out of Columbus.

CMH and the aircraft that arrive and depart there are relied upon as a means of sending and receiving such couriers.

c. Illegal drug and drug currency couriers often purchase "quick-turn" trips, which are trips with short stays in narcotic source or destination areas, as the nature of their business does not require more than a quick drop-off or pick-up.

d. Illegal drug and drug currency couriers commonly travel using one-way tickets, as a known time of return is not readily available at the time of booking, and they often purchase tickets within 72 hours of departure.

e. Illegal drug and drug currency couriers commonly fly into one city and depart from another city.

f. Illegal drug and drug currency couriers often carry a limited amount of clothing due to their short stays in their destination cities.

31. Based upon their training and experience, TFOs D'Orazio and Ward advised Kermit Warren that they had reason to believe that the currency in his possession was proceeds from illegal drug activity and that the DEA would be administratively seizing the currency.

32. Kermit Warren accepted a copy of the DEA seizure receipt, and the officers left the area.

33. After taking possession of the currency, the officers returned to the DEA's airport office for further investigation and requested assistance from CRAA K-9 Officer Dale Beam ("Officer Beam") and certified narcotic odor detection K-9 "TRex" to conduct a K-9 sniff of the seized currency.

34. The currency seized from Kermit Warren was placed in a new United States Postal Service Priority Mail package ("USPS package") and sealed.  The narcotic detection K-9 sniff

consisted of two separate K-9 sniffs as follows.

  a. Ten USPS packages were placed in a circle in the DEA office. Three packages were empty, and seven contained shredded, circulated and un-circulated currency. Officer Beam and K-9 TRex entered the area, and Officer Beam gave K-9 TRex the command to search. K-9 TRex sniffed all ten packages and the room and did not show any change in behavior. Officer Beam and K-9 TRex then left the area.

  b. TFO Ward entered the area and replaced one of the packages with the USPS package that contained the money from Kermit Warren. The location of the money was unknown to Officer Beam.

  c. Officer Beam and K-9 TRex returned to the area, and Officer Beam gave K-9 TRex the command to search. As K-9 TRex sniffed the packages, Officer Beam noted that K-9 TRex showed a change of behavior on one of the packages. Officer Beam noted that K-9 TRex's breathing quickened, and he quickly squared up to the package. K-9 TRex then placed his front paws on the package and indicated a positive alert for the odor of narcotics by scratching on the package. TFO Ward advised Officer Beam that it was the package containing the money seized from Kermit Warren.

35. An official count of the United States currency seized from Kermit Warren's bag revealed that the currency totaled $28,180.00 (the defendant).

| Denomination | Quantity | Total |
|---:|---:|---:|
| $100 | 249 | $24,900.00 |
| $50 | 62 | $3,100.00 |
| $20 | 9 | $180.00 |
|  |  | $28,180.00 |

36. Additional investigation revealed that since at least 2020, Kermit Warren and Leo Warren were linked to a residence located at 728 Tricou Street, New Orleans, Louisiana. In or about September 2020, the DEA in New Orleans, Louisiana, received information regarding suspected drug trafficking at 728 Tricou Street.

37. On or about January 8, 2021, the DEA received a timely claim from Kermit Warren in the administrative proceedings. In his claim, Kermit Warren asserted that the currency is his life savings, earned from work and inheritance. Kermit Warren did not include any documents supporting these statements with his claim.

38. Based on the foregoing facts, the United States asserts that the defendant, $28,180.00 in United States currency, represents property furnished or intended to be furnished in exchange for a controlled substance, represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846. Therefore, the property is subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

## **CLAIM FOR RELIEF**

WHEREFORE, the plaintiff respectfully requests that:

(a) pursuant to Rule G(3)(b)(i), Supplemental Rules, the Clerk issue a warrant of arrest *in rem*, directing the United States to arrest and seize the defendant and to retain the same in its custody subject to further order of the Court;

(b) the Court, pursuant to Rule G(4), Supplemental Rules, direct the United States to give notice to all persons and entities having an interest in the defendant to assert, in conformity with the law, a statement of any interest they may have, including notice by publication on the official government website, www.forfeiture.gov, for 30 consecutive days;

(c) the forfeiture of the defendant to the United States be confirmed, enforced, and ordered by the Court;

(d) the Court thereafter order the United States to dispose of the defendant as provided by law; and

(e) the Court award the United States all other relief to which it is entitled, including the costs of this action.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney


s/Deborah D. Grimes
DEBORAH D. GRIMES (0078698)
Assistant United States Attorney
Attorney for Plaintiff
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
Deborah.Grimes@usdoj.gov

## **VERIFICATION**

I, Andrew T. D'Orazio, hereby verify and declare under the penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint for Forfeiture and know the contents thereof, and that the matters contained in the complaint are true to my own knowledge, except those matters stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case.

I hereby verify and declare under the penalty of perjury that the foregoing is true and correct.

4/7/2021
Date

ANDREW T. D'ORAZIO, Task Force Officer
Drug Enforcement Administration